### LEE COKER v. THE STATE.

*No. 645.    Decided June 26, 1895.*

**1.   Murder—Evidence as to Investigation of Before Grand Jury—Foot Tracks.**

On a trial for murder, where one of the main inculpatory facts was the foot tracks near the scene of the killing, going in direction of, and near defendant's home; and, where it was shown that on the day of defendant's arrest, and just before he was lodged in jail, he was permitted to go by his home, where he changed his clothing and shoes, and that the shoes had never been seen afterwards. Held: That while these facts were admissible, it was error for the court to permit, in connection therewith, and over defendant's objection, evidence that the grand jury and the District Attorney made diligent search for the shoes; and the character and the extent of the efforts made by them to find said shoes.

**2.   Same—Impeachment of a Witness.**

On a trial for murder, where a witness for defendant had testified to an alibi. Held: That it was error to permit evidence to be introduced for the purpose of impeaching him, to the effect that the grand jury had made diligent efforts to have before them all persons knowing anything about the facts, and that this alibi wit-

ness of defendant's was not before the jury, and that the grand jury nor the District Attorney ever heard of his knowing anything about the case. Such method of impeaching a witness is unknown to the law.

### 3. Same—Charge of Court—Limiting and Restricting Impeaching Evidence.

Whenever, on a criminal trial, legitimate evidence has been introduced for the purpose of impeaching the credit of a witness, it is error for the court to fail or refuse to limit it to the only purpose for which it was admitted, and for which it could be considered, viz: as to its effect upon the credit of the witness.

APPEAL from the District Court of Van Zandt. Tried below before Hon. FELIX J. McCORD.

Appellant was indicted in the county of Henderson for the murder of one Thomas Fulton in that county on the 1st day of September, 1887. On application of defendant, the venue was changed to the county of Van Zandt. At his trial, in this latter county, he was convicted of murder of the first degree, his punishment being assessed at imprisonment for life in the penitentiary.

Thomas Fulton was killed sometime between 8 and 10 o'clock on the night of the 11th day of August, 1887. He had eaten his supper, and gone out upon his gallery and taken a drink of water at a water bucket, and walked up the gallery, and placing his hand upon a post, stood with his face toward the gate. His position threw him in a flood of light from the dining room door. He had hardly taken his position before a gun was fired outside, in front of the house, and he fell, having been killed instantly. His daughter, now Mrs. Mattie Davis, was sitting on the gallery, and witnessed the shooting, but the night was very dark, and she could not see the party who did it.

Mrs. Fredonia Fulton testified: "I am the widow of Thomas J. Fulton, frequently called Tom Fulton. My husband is dead. He was shot and killed in Henderson county, Texas, on the night of the 11th day of August, 1887. He died instantly after being shot. The killing occurred about two hours after dark, somewhere between 8 and 10 o'clock at night, and while my husband was standing on our front gallery. On the night he was killed I came from my son-in-law's, Mr. Millard Wills', and got home a little after dark. Mr. Wills lived about 400 yards from our house. When I reached home the family had finished supper. Supper was then prepared for me, and I had finished eating when I heard the report of the gun. I heard my daughter scream, and I ran out on the front porch and called my husband. He failed to answer, and I knew he was dead. It was so dark I could not see him. I began to feel around on the gallery for him. I found him lying on his back on the porch. I took his head up in my arms and found that he was dead. I immediately began to call my son-in-law, Mr. Wills, and heard him reply at once that he was coming. I could tell from his voice that he was at home when he answered. I kept screaming and he kept answering, his voice seeming nearer and nearer, until he reached us. My husband, myself and my two daughters and my little grandchild, were all that were present that night my

husband was murdered. We have no sons. My daughters were then single; they have since married. I saw no one after the gun was fired, and heard no one running off. I know Lee Coker, the defendant. There he is. (Witness points out defendant). I know the father of Lee Coker; his name is Jim Coker; was sent to the penitentiary from Henderson county about two years before my husband was killed. My husband and myself were witnesses against Jim Coker, and on our testimony he was convicted. That trouble came up in this way: About two years before the murder of my husband, one night, when all the family, except my husband and myself, were away from home, the defendant, Lee Coker, and his father, Jim Coker, came to our house. The first we heard was some one crying at the front gate "hello!" My husband went to the front door and asked what was wanted. The parties at the gate, (who proved to be the defendant and his father), replied that they were strangers in the country; that they were trying to find their way to Athens, and asked for directions. The two Cokers were not strangers in the country, but had lived there for years, and were perfectly familiar with all the roads and directions. My husband went out to the gate to give them directions, and left me standing on the gallery. About the time my husband got to the front gate, I heard some one say to him with an oath: "You had the advantage of me on yesterday, but we have got it of you now." I then ran out to the gate, where my husband was, and there found the defendant, Lee Coker, and his father, Jim Coker. They were both armed and mounted. Defendant had a pistol, and the old man had a shotgun. Old man Coker threw the shotgun down on my husband and said he was going to kill him. My husband begged him not to kill him in the presence of his family, but if he was determined to kill him, to carry him off from his house and away from the presence of his family, and then kill him. Old man Coker cursed him, and swore that he would kill him then; and again threw his shotgun down on him. I grabbed the gun, and struggled with Mr. Coker for its possession. In the struggle I was jerked up against the gate, and the gun was wrenched out of my hands. Then the old man again threw the gun down on my husband. I seized it again and held it, while I begged them not to kill my husband. Old man Coker replied, that if they did not kill him, my husband would report them. My husband replied that he had never reported any one yet. While this was going on, the defendant, Lee Coker, had got down off his horse and was standing on the ground, near my husband, with a pistol in his hand. After awhile, the Coker's agreed to let my husband off, and mounted their horses and rode away. As they rode off, old man Coker said, that if my husband did report them that they would get him yet. My husband did not report them; but the next grand jury was informed of the occurrence and they were indicted, and old man Coker was sent to the penitentiary for two years for an assault to murder my husband—committed that night. I do not know who shot my husband. I made no effort myself to track the assassin the next morning. The sheriff of Henderson county, Mr. Os-

borne, and his deputy, Mr. McRae, and several others, came to my house about daylight after the killing, and began the search."

The indictment and judgment in the case of the State v. James Coker, for assault to murder Thomas Fulton, were put in evidence; and his record shows that Thomas Fulton was one of the witnesses for the State in that case. The judgment showed that the penalty assessed was two years in the penitentiary.

Sam Nunn testified: "I assisted the sheriff and his deputy, in searching for tracks, to see if we could ascertain who did the murder. We first examined near the front gate. There, we found some tracks, as if a party had been squatting down and standing close to the front gate post. We saw some tracks leading away from that place, but they were not very distinct. We then went West of the house to the trail way that led from the house to the spring. About 100 yards we found a track in the path. We tracked this back to the spring. The party who made it was coming from the spring towards the house of the deceased. Out to the left of the path, we found where the party making the tracks, had hung his foot under a black jack bush, that had been cut nearly off at the bottom and bent over. The party had stumbled, and it showed where he had fallen to his hands. The bush was about six inches from the ground. We then followed the track to where it went back to the spring. We found the track around the spring. Mr. Osborne measured the track where we found it, near the spring. These tracks were all about a number 7 or 8, one of the shoes was run down, and in one of the soles of one of the shoes there was a 'V' shaped cut. After examining these tracks, at the request of the sheriff and his deputy, I piloted them to the house of Lee Coker, the defendant. In a lane about 200 yards before reaching the house where defendant lived, I saw a track which had the same peculiarities as the track I have been describing, and I took it to be the same tracks. The track led up the lane to Lee Coker's house. I also saw a track with the same peculiarities in the corner of the yard where the defendant lived. I don't know how long these tracks had been made, but they appeared to me to be fresh."

George Osborne, witness for the State, testified: "In August, 1887, and at the time of the killing of Thomas Fulton, I was sheriff of Henderson County. On the night of the 11th of that month, I was notified of the murder. I reached the scene of the killing about daylight, and found Thomas Fulton dead on his front gallery. He was shot in the breast with a shot-gun. I began at once to investigate. Between the front gate and the gallery where deceased was shot, I found the gun wadding. It was a part of a printed newspaper. I picked up the pieces of gun-wadding, spread them out and carefully put them away in my pocket-book. I next examined and found where some of the shot had entered the door and the walls of the house. There were three sizes of the shot. I took them to be buck-shot, turkey-shot and duck-shot. I next looked for tracks, where the assassin stood. By that time there had been so much walking about the gate I could not tell anything

definitely. My party then went down in the direction of the spring.
Between the house and the spring we found a track coming from the
direction of the spring, and coming in the direction of the house.   The
size of track was about a number 7 or 8; one of the shoes was run down,
and there was a peculiar cut in one of the soles.   I tracked this track
back, and sometimes it was in the path and sometimes out of it.   At
one place, I found where the party making the track had hung his foot
under a sapling.   The sapling had been cut off with an axe, and bent
over, but was still fastened to the stump; the foot had been slipped
under and pulled back, and made a plain track under the sapling.   He
appeared to have stumbled.   It looked like some one had did it, who
was walking in the dark and could not see the sapling.   I then fol-
lowed the track on back to the spring, and there it appeared, that the
party making the track had walked backwards and forwards and stood
about there some considerable time.   I took the measure of the track
there on my gun scabbard, but I have since lost it.   I then followed
the track, in a direction that would have led towards the defendant's
home, about 400 yards to where I struck a hard glade and could track
it no farther.   My deputy and I then got Mr. Sam Nunn to take us to the
home of Lee Coker, the defendant.   When we reached the mouth of the
lane leading up to his house, we saw a track in the lane that looked just like
the track I have described, and I took it to be the same track.   When we
reached the house, we found out from defendant's mother that he was
at Joe Coker's at work.   I went into the house and took a shotgun out
of the house, and shot-pouch and newspaper hanging up by the shot-
pouch.   The newspaper was a part of the 'Comanche Chief.'   In the
shot-pouch I found a small piece of paper, that I took out and put in
my pocket-book, separate from the pieces that I picked up at the dead
body.   I also found in the shot-pouch three sizes of shot; being buck-
shot, turkey-shot, and duck-shot.   The shotgun was a double barreled
gun, and one barrel of it had been freshly discharged.   I am used to
fire arms, and I think I can say certainly, that this gun barrel had been
freshly discharged.   This barrel had been reloaded.   I carried this gun,
the newspaper, the shot-pouch and the wadding with me back to Athens.
It was not out of my possession until I gave it up, as I will proceed
to tell.   On our way over to Joe Coker's where we arrested the defend-
ant, we saw a track between the home of the defendant and where we
arrested him, that in all respects was just like the tracks we found at the
spring and at the other places I have mentioned.   At Joe Coker's house,
my deputy, Mr. McRae, arrested the defendant.   The defendant then
had on an old pair of shoes that seemed to be too short for him, and had
been cut at the toes.   On our way to Athens with the defendant,
we went by his home, and he asked permission to change his clothes.
We granted it, and he changed his clothes and changed his shoes; and
we have never seen those shoes since.   I carried the defendant to Athens
and put him in jail.   I also carried the defendant's gun and the shot-
pouch, newspaper and the wadding, to Athens.   I carried the gun to a

blacksmith and had the wadding carefully removed from both barrels. I kept the contents of each barrel carefully separated from the other, and from everything else. I then got Gus Davis, and J. J. Faulk, Esq., the District Attorney, to assist me. We first took the wadding and put each lot in a separate envelope, and labeled them; that is, we put the wadding found at the dead body in one envelope; that extracted from the defendant's gun in two separate envelopes; the piece of paper found in the defendant's shot-pouch in another, and so on. We likewise kept all the shot separated. (Witness was here handed the envelopes, and stated that they were the original envelopes used and labeled by himself, Gus Davis and J. J. Faulk, as above stated). These envelopes read just as we marked them. They are as follows: (First envelope)— 'Got out of the defendant's shot-pouch, containing a piece of newspaper, August 12, 1887.' (And in the upper corner of the envelope) 'Henry McRae, George Osborne.' (Second envelope)—'The piece of wadding in envelope was found at the dead body, and corresponds with the piece found in the shot-pouch of Lee Coker, the defendant.' (Signed) 'Osborne and McRae.' (Third envelope)—'This wadding was taken out of the right hand barrel of Lee Coker's gun, the morning after the shooting, by Sheriff Osborne and Deputy McRae.' (Fourth envelope)— 'This wadding from the barrel freshly loaded; left-hand barrel.' (From the next envelope)—'This sample of shot was taken from Lee Coker's shot-pouch the morning after the shooting of Tom Fulton.' (Signed), 'Osborne and McRae.' (From the next envelope)—'Shot cut out of wall of deceased's house.' (From the next envelope)—'Shot taken from the shot-pouch of defendant.' (From the next envelope)—'This envelope contains the shot found in the left-hand barrel of the defendant's gun, taken from Lee Coker's house by Sheriff Osborne and Deputy McRae, the morning after the shooting. This barrel showed to be freshly loaded when the gun was taken from Coker's house.' (From the next envelope)—'This envelope contains the shot taken from the right-hand barrel of the gun taken from Lee Coker's house, the morning after the shooting, by Sheriff Osborne and Deputy McRae. And the shot corresponded with the wounds in the dead body of Tom Fulton, and in the walls of the house.'

(After identifying the envelopes, and reading the endorsements upon them, the witness proceeded as follows:) "These endorsements on these envelopes were made upon them in my office, in the presence of Gus Davis and J. J. Faulk, as I have before stated, the day after the homicide. Mr. Faulk, Mr. Davis and I took all the wadding and carefully fitted it up together to see if it would correspond. The wadding I found at the dead body had the picture of a man's head and an advertisement of a dry goods firm on one side of it, and a portion of Talmage's sermon on the other. And where the paper was torn in two, it was the word 'quantity' in the advertisement referred to. We found, by putting the wadding found at the dead body with the piece found in the shot-pouch, that the first portion of the word 'quan' was on the

wadding found at the dead body, and the remainder of the word, 'tity,' was found on the piece in the shot-pouch. Putting the pieces of paper found at the dead body beside that found in the defendant's shot-pouch, we found that they fit right up, and read right off. It was a part of an advertisement of a Comanche firm containing the words, 'Allover *and* hamburger laces in any quantity,' the word 'quantity' being torn as above stated. Turning the paper over they each fit exactly together and read connectedly, and each contained a portion of Talmage's sermon. The pieces of paper found in the barrels of the gun also fit and corresponded with the balance of the wadding. They all showed to be a part of the same paper, and read right along and made sense. The wadding found in the right-hand barrel of the gun contained the heading of Talmage's sermon, preached from the text, 'The Swelling of the Jordan.' Putting all this wadding together, that found in the gun, that found at the dead body, and that found in the defendant's shot-pouch; and putting all this with the balance of the newspaper, found in the house, they all showed to be a portion of 'The Comanche Chief,' a paper published at Comanche, Texas, on the 12th of March, 1887. On the opposite side of the papers containing the word 'quantity,' and the advertisement, there was this part of Talmage's sermon: 'Who watched you last night? Who has been kind and good to you all your life long? O, how ungrateful we have been! Methinks the goodness of God ought to lead this whole audience to repentance.' This quotation is found in the published sermon of Dr. Talmage on the subject, 'The Swelling of the Jordan.' A portion of this quotation was found on the separate pieces of the wadding, and by putting them together they formed the words and would read exactly as they were found in the newspaper published at Comanche on March 12th, 1887, called the 'Comanche Chief.' The shot we found in the two barrels of the defendant's gun, the shot in the defendant's shot-pouch, the shot in the wall of deceased's house, and the shot in the body of deceased were all alike. They were mixed shot of three sizes—buck-shot, turkey-shot and duck-shot. After making this investigation, we put the wadding back, and the shot as well, in its each separate envelope, and turned them over to the Clerk of the District Court of Henderson County. All of this evidence was here on the other trial of this case. It is not all here now, some of it has been lost. I do not find the wadding we found at the dead body here. Some of the shot has been lost also, since the last trial. The envelopes are here just as we marked them when we made the investigation, as I have just described. The grand jury met in September following the homicide, and a very diligent, thorough investigation was made into this crime. We had everybody in the neighborhood of the killing before the grand jury. Lee Coker was in jail at the time. Everybody was summoned who was supposed to know anything about the crime. The grand jury did not have W. P. Towery before them, but they did have Mrs. Sallie Coker as a witness. We tried two or three times, by subpœnas duces tecum, to get the shoes which Lee Coker had on when arrested, but we failed to secure them."

Sam Cox, witness for the State, testified: "About a year before the homicide I was coming from Athens with Lee Coker, and we had a talk about the deceased. Old man Coker had been sent to the penitentiary for an assault on Fulton, and I asked Lee Coker how long it would be before his father's time was out. He replied, 'about a year, but it is not half done with.' He said he was going to get his shot-gun and kill old Tom Fulton, and I would hear of it. He said that he would shoot his life out. I told him not to tell me anything about it, for if Tom Fulton was killed I might have to testify against him."

Mrs. Laura Brown, witness for the State, testified: "Some time in 1886, about a year before the death of Thomas Fulton, I was going home from Athens in company with my little brother, when the defendant, Lee Coker, overtook us and rode up beside me. We began a conversation, and finally got to talking about his father being in the penitentiary for trying to kill Mr. Fulton. The subject seemed to enrage him very much, and he finally said to me, 'that while his father was serving his term in the penitentiary, Tom Fulton will be serving his term in Hell.' He was very angry. There was no one present except myself, the defendant and my little brother."

Frank Cotton, witness for the State, testified: "I lived in Athens, Henderson County. I lived there in 1887, and was clerking in a hardware store. I remember when Thomas Fulton was killed. About two or three weeks before Fulton's death the defendant, Lee Coker, came into the store and said he wanted to buy some shot. He finally selected the sizes of shot that he wanted, and I sold him a quarter's worth of shot. They were turkey-shot, duck-shot and buck-shot mixed."

Dr. Will Mathews, witness for the State, testified: "I live in Athens, Henderson County, Texas. My father was postmaster at Athens in 1887, and I worked in the office. During that year two copies of the 'Comanche Chief,' a paper published at Comanche, Texas, came to that office. One of the copies came to W. R. Coker, a cousin of the defendant. Lee Coker, the defendant, would frequently call for the Coker mail, and when he did I would give him out the 'Comanche Chief,' which was taken by any one in the section of the county where the defendant lived, was the one taken by W. R. Coker, and sometimes taken from the postoffice by the defendant."

J. J. Faulk testified substantially as did Sheriff Osborne about the contents of the envelopes in which they placed the wadding, pieces of the "Comanche Chief," and the bullets or different sized shot. The following is his testimony with regard to the investigation of the case by the grand jury and himself. "The grand jury met after the homicide (in August) on the first Monday in September. We investigated the murder thoroughly, and ransacked the whole county for testimony. We sent two subpœnas duces tecum to get the shoes the defendant had on at the time he was arrested, and we failed to get them. W. P. Towery was not before the grand jury. I never heard of his knowing anything about the case. There was a habeas corpus trial. W. P. Towery was

a witness then, and I never heard of his being a witness until that trial. I testified in this case at the former trials."

The defense was an alibi, and the principal witnesses were, 1st, W. P. Towery, and 2nd, Mrs. Sallie Coker; and these two witnesses testify positively to defendant's being at his home on the evening that Thomas Fulton was killed, Towery testifying that he remained there talking to defendant until near 10 o'clock; and Mrs. Coker testifying that defendant was at home all that night after Towery left. That she saw him frequently during the night, as she was up and down on account of a sick child.

*Kearby & Muse,* for appellant.—The court erred in admitting in evidence over the objection of the defendant, the testimony of George Osborne and J. J. Faulk in relation to the efforts, diligence and failure of the grand jury of Henderson County, and of said witnesses to find and obtain the shoes of the defendant worn by him at the time of his arrest; and the issuance of subpœnas duces tecum by said grand jury for the purpose of obtaining them, the defendant during said time being in jail; for that, it was not shown that the defendant was responsible for the failure to discover the shoes, and was not a party to the ex-parte investigations of the grand jury, and their acts and conduct was not a legitimate issue in the case, and the defendant was not responsible therefor.

Objections to all this character of testimony was reserved in the exceptions relating to the ransacking of the county for testimony, and the efforts of the grand jury and officers to procure the shoes in question, and which bill of exceptions are hereinbefore substantially set forth. No charge was given by the court defining the purpose or object of said testimony, nor any limitation placed upon the consideration to be given thereto by the jury. It was not shown that the defendant had any connection with the shoes in their disposition in the avoidance of the subpœnas duces tecum.

1. Testimony was inadmissible, pertinent to no legitimate issue in the case, for that, the logic of the testimony was to show a concealment of the shoes by others than the defendant, in that the shoes were delivered by defendant's step-mother to his then counsel, while the defendant was in jail, without proof of his connection therewith or knowledge thereof. And the sole purpose of said testimony could only have been to hold defendant responsible for their concealment. And the same was hurtful and prejudicial to defendant. Maines v. State, 23 Tex. Crim. App. 568, 576; Favors v. State, 20 Tex. Crim. App. 156, 161; Nalley v. State, 28 Tex. Crim. App. 387, 392.

2. The court erred in failing to charge the jury as a part of the law of the case, that said testimony, in relation to the diligence of the grand jury and officers to obtain the shoes in question, and the disposition of said shoes made by Mrs. Coker could not be considered against the defendant, he not being shown to have been connected therewith, or a party to any of said proceedings. Littlefield v. State, 24 Tex. Crim. App.

35 Crim. Rep.—5.

167, 169; Davidson v. State, 22 Tex. Crim. App. 379; Moody v. State, 24 Tex. Crim. App. 477; Washington v. State, 23 Tex. Crim. App. 336, 338.

The details of the alleged assault to murder committed by James Coker upon T. J. Fulton, together with the certified copies of the trial and conviction therefor, were inadmissible against the defendant. Maines v. State, 23 Tex. Crim. App., 568, 576; Favors v. State, 20 Tex. Crim. App., 156, 161; Nalley v. State, 28 Tex. Crim. App., 387, 392.

If admissible, the court erred in failing to instruct the jury for what purpose said testimony might be considered by them, and in failing to restrict the same to the issue of motives.    Davidson v. State, 22 Tex. Crim. App., 379.

The court erred over objection, in permitting the witness, J. H. Wofford, to testify in impeachment of defendant's witness, Sallie Coker, to the effect that said witness testified before the grand jury upon a finding of the indictment, that no person was present at her home on the night of the homicide, other than herself and family, because no predicate for such impeachment had been made.

The court erred in failing to instruct the jury as to the weight and purpose of said impeachment, and that said testimony could only be considered in determining the credibility of the witness, and not in proof of the fact testified to by the impeaching witness.

The court erred in failing to instruct the jury that the impeaching testimony could be considered only and solely for the purpose of determining the credibility of the witness, Mrs. Sallie Coker.    Foster v. State, 28 Tex. Crim. App., 45, 50, and authorities cited.    Thompson v. State, 29 Tex. Crim. App., 209.

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This is a conviction for murder of the first degree, the punishment being assessed at confinement in the penitentiary for life.    Counsel for appellant contend that the court erred in the following particulars:    "The court erred in admitting in evidence, over the objection of the defendant, the testimony of George Osborne and J. J. Faulk in relation to the efforts, diligence and failure of the grand jury of Henderson County and of said witnesses to find and obtain the shoes of the defendant, worn by him at the time of his arrest, and the issuance of subpoenas duces tecum by said grand jury for the purpose of obtaining them, the defendant during said time being in jail, for that it was not shown that the defendant was responsible for the failure to discover the shoes, and was not a party to the ex parte investigations of the grand jury, and their acts and conduct were not a legitimate issue in the case, and the defendant was not responsible therefor.    One of the cogent facts relied upon by the State for conviction was certain tracks from near where the fatal shot was fired, in direction of and near to defendant's home.    The distinguishing feature in the tracks was what the witnesses characterized as having been made by No. 7 or 8 shoes, one of

which was run down with a peculiar V-shaped cut in the sole of one of them, as evidenced by the tracks. The defendant was arrested at his uncle's, a mile or two from his own house. He then wore an old pair of shoes, seemingly too short for him, which had been cut at the toes. He was carried by his home, and, at his request, was there permitted to change his clothing. The defendant also changed his shoes. He was then carried to Athens, and lodged in jail. The witness, Osborne, states that the shoes worn by the defendant at the time of his arrest, and upon said changing of his clothing, had not since been seen by him. It was to obtain these shoes that the efforts of the grand jury were directed, the defendant in the meantime being in jail. The witness, Osborne, testified that the grand jury met in September following the homicide, and a very diligent and thorough search was made into this crime. "We had everybody in the neighborhood of the killing before the grand jury. Everybody was summoned who was supposed to know anything about the crime. The grand jury did not have W. P. Towery before them, but they did have Mrs. Sallie Coker as a witness. We tried two or three times by subpœnas duces tecum to get the shoes which Lee Coker had on when arrested, but we failed to secure them. J. J. Faulk testified that he was then District Attorney of Henderson county; that the grand jury met after the homicide in August, on the first Monday in September. We investigated the murder thoroughly, and ransacked the whole country for testimony. We sent two subpœnas duces tecum to get the shoes the defendant had on at the time he was arrested, but we failed to get them. W. P. Towery was not before the grand jury. I never heard of his knowing anything about the case. There was a habeas corpus trial. W. P. Towery was a witness then, and I never heard of his being a witness until that trial." And to the testimony of George Osborne, offered by the State, to the effect that the grand jury investigated the matter thoroughly, and ransacked the country thoroughly for all the evidence they could secure, and issued subpœnas duces tecum for the shoes that the defendant had on the morning he was arrested, and to the questions eliciting the same, the defendant then and there, at the time of the trial, objected, upon the ground that the investigations of the grand jury were secret, and that the defendant was not there represented, either by himself or by counsel, and that the diligence of the officers of Henderson County was in no way an issue in the case, which objections were by the court overruled, and the testimony admitted, and to which the defendant duly reserved his bill of exceptions, and which bill of exceptions the court qualified as follows: "The court permitted the inquiry to show the diligence used by the State to obtain the shoes the defendant wore on the night of the homicide, and the failure of the State to obtain them. And to the testimony of the witness J. J. Faulk, offered by the State to prove the efforts made by himself as District Attorney, and the work of the grand jury in investigating the crime at the time the defendant was indicted, the defendant at the time of the trial then and there objected thereto, because the investigations of the grand

jury were matters of secrecy, and the defendant was neither represented by himself nor counsel before that body, and that the acts of the grand jury and their diligence in no way affected the rights of the defendant; but the objections of the defendant were overruled, and the testimony admitted, and to which the defendant reserved his bill of exceptions." The bill of exceptions relating to the testimony of J. J. Faulk was signed by the court, with this qualification, to-wit: "The court permitted the State to prove by the witness Faulk the efforts that were made by himself as District Attorney, and by the grand jury of Henderson County, which convened a few days after the homicide, to find the shoes which the defendant had on at the time of the homicide." The injury from such testimony is emphasized in the fact that Towery was a witness for the defendant as to alibi, and was disparaged by the testimony of Osborne and Faulk relating to said grand jury investigations. The injurious significance of said testimony relative to the diligence of the grand jury in the effort to procure said shoes is still further emphasized by the fact that the State, upon cross-examination of the defendant's stepmother, Mrs Sallie Coker, elicited the fact from her that a bailiff of the grand jury came to her for the shoes that the defendant had on the day he was arrested; that the bailiff came twice for them, but did not get them, because witness had turned the shoes over to Mr. Richardson, the then attorney for the defendant, and witness had not seen shoes since. Objection to all this character of testimony was reserved in the exceptions relating to the ransacking of the country for testimony, and the efforts of the grand jury and officers to procure the shoes in question, and which bills of exception are hereinbefore substantially set forth. No charge was given by the court defining the purpose or object of said testimony, nor any limitation placed upon the consideration to be given thereto by the jury. It was not shown that the defendant had any connection with the shoes in their disposition in the avoidance of the subpœnas duces tecum." The above objections and reasons for making same will now be noticed. The State, under the circumstances of this case, had a right to prove that the shoes could not be found; but all evidence introduced for the purpose of showing the character of the diligence used by the grand jury or any one else to discover the guilty party, or to ascertain which person knew anything about the facts of the case, was clearly inadmissible; such as, "W. P. Towery was not before the grand jury," "I never heard of his knowing anything about the case," "I never heard of his being a witness until at the habeas corpus trial, "the grand jury investigated the matter thoroughly and ransacked the country thoroughly for all the evidence they could secure." Now, Towery was a witness for the defendant, in support of alibi. His testimony was indirectly attacked by the evidence of Faulk and Osborne, the reasoning or deduction being that as Faulk and Osborne and the grand jury made diligent efforts to discover the witnesses in the case, and as Towery had not been discovered, therefore his evidence as to the alibi was manufactured. This is a method of impeaching a witness un-

known to the law.　Again, if Mrs. Sallie Coker concealed the shoes, appellant was not responsible for her acts.　She, however, being a witness for him, the State, for the purpose of proving that she was very much biased in his favor, if not wholly corrupt, and therefore wholly unworthy of belief, could show it.　This evidence, however, was not limited to the only purpose for which it could have been introduced.　The jury were not instructed to consider it only for the purpose of impeaching Mrs. Coker.　In the absence of instructions clearly and emphatically limiting it to its proper use, the jury would in all probability reason thus:　The mother knew her son to be guilty; she knew or believed that his shoes, if found, would convict him; hence her conduct.　She concealed them from the officers, etc.　For the reasons indicated, the judgment is reversed and cause remanded.

*Reversed and Remanded.*